James M. TERRY, by and Through His Mother and Next Friend, Arbunes TERRY, and Arbunes Terry Plaintiffs

v.

Richard HILL, Deputy Director, Division of Mental Health Services, Arkansas Department of Human Services in his Official Capacity Defendant

No. 4:01CV458 SMR.

United States District Court,
E.D. Arkansas,
Western Division.

May 6, 2002.

Bettina E. Brownstein, Wright, Lindsey & Jennings, Little Rock, AR, for Plaintiffs.

Frank J. Wills, III, Arkansas Judicial Discipline & Disability Com'n., Little ROck, AR, for Richard Hill.

David M. Fuqua, Hilburn, Calhoon, Harper, Pruniski & Calhoun, Ltd., North Little Rock, AR, for Randy Johnson.

*MEMORANDUM OPINION*

REASONER, District Judge.

*Introduction:*

Plaintiffs filed this class action pursuant to 42 U.S.C. § 1983 alleging that Richard Hill, in his individual [1] and official capacity

---

**1.** The Court granted Plaintiffs' Motion to Dismiss the complaint against Richard Hill in his individual capacity on January 25, 2002.

as Deputy Director, Division of Mental Health Services ("DMHS"), Department of Human Services ("DHS"), violated the rights of the serious mental health needs of Plaintiffs in violation of the Fourteenth Amendment to the United States Constitution.

### The Class:

The Court entered an Order dated November 9, 2001, certifying the following class:

> All persons charged with or under indictment for various criminal offenses who are suffering from mental illness, are confined as inmates in detention facilities in Arkansas, and who have either been ordered by the circuit courts in the counties where charges are pending to undergo an inpatient forensic mental evaluation at the Arkansas State Hospital or ordered by a court to be committed to the Arkansas State Hospital for treatment.

### The State's Duty:

The Arkansas Constitution speaks of the State's duty toward the mentally ill. Art. 19, § 19 provides, "[I]t shall be the duty of the General Assembly to provide by law for the support of institutions for the education of the deaf and dumb and the blind, and also for the treatment of the insane." The Arkansas State Hospital ("ASH"), a division of the DHS, is the state facility that has responsibility for treating citizens committed to its care either by civil courts or by criminal courts for evaluation or treatment. There is no other entity, private or public, which is equipped or authorized to handle forensic[2] patients. The ASH's duty to provide evaluation and treatment to jail inmates arises from a comprehensive set of statutes enacted by the legislature: Ark.Code Ann. § 5–2–305 (Repl.1997) provides:

> (a)(1) The [circuit] court, subject to the provisions of §§ 5–2–304 and 5–2–311, shall immediately suspend all further proceedings in the prosecution whenever:
>
> > (A) A defendant charged in circuit court files notice that he or she intends to rely upon the defense of mental disease or defect;
> >
> > (B) There is reason to believe that the mental disease or defect of the defendant will or has become an issue in the cause;
> >
> > (C) A defendant charged in circuit court files notice that he or she will put in issue his or her fitness to proceed; or
> >
> > (D) There is reason to doubt the defendant's fitness to proceed...,
>
> (b)(1) Upon suspension of further proceedings in the prosecution, the court shall enter an order:
>
> > (A) Directing that the defendant undergo examination and observation by one (1) or more qualified psychiatrists or qualified psychologists; or
> >
> > (B) Appointing one (1) or more qualified psychiatrists not practicing within the Arkansas State Hospital to make an examination and report on the

---

**2.** Forensic is defined as "belonging to courts of justice." Black's Law Dictionary 648 (6th ed.1990). The term forensic is used in Ark. Code Ann. § 5–2–305(b)(2) (Repl.1997) to describe the evaluation a pretrial inmate is ordered to undergo if his fitness to proceed to trial is in issue. Dr. Larry Miller, medical director of the ASH, defined the populations at the ASH as a forensic population, an adult civil population and an adolescent population. He defined forensic as, "[t]hose ... patients who were sent to us from the circuit courts for either forensic evaluation or treatment. There's been a criminal act allegedly involved." (Excerpted Tr. Vol. 1 at 46). The Court will use the term forensic in this opinion as used and defined by Dr. Miller.

mental condition of the defendant; or (C) Directing the Director of the Division of Mental Health Services of the Department of Human Services to determine who shall examine and report upon the mental condition of the defendant.

(2) The Director of the Division of Mental Health Services or the director's designee shall determine the location of the forensic evaluation.

(3) The examination shall be for a period not exceeding thirty (30) days, or such longer period as the director or the director's designee determines to be necessary for the purpose....

Under Ark.Code Ann. § 5–2–310 (Repl. 1997), circuit courts may commit a criminal defendant to the custody of the DHS for treatment until restoration of fitness to proceed. That statute provides:

(a) If the court determines that the defendant lacks fitness to proceed, the proceeding against him shall be suspended, and the court may commit him to the custody of the Director of the Department of Human Services for detention, care, and treatment until restoration of fitness to proceed. If, however, the court is satisfied that the defendant may be released without danger to himself or to the person or property of others, the court may order his release, which shall continue at the discretion of the court on conditions the court determines necessary. A copy of the report filed pursuant to § 5–2–305 shall be attached to the order of commitment or order of conditional release.

(b)(1) Within a reasonable period of time, but in any case within ten (10) months of a commitment pursuant to subsection (a) of this section, the Director of the Department of Human Services or his designee shall file with the committing court a written report indi-

cating whether the defendant is fit to proceed, or if not whether:

(A) The defendant's mental disease or defect is of a nature precluding restoration of fitness to proceed; and

(B) The defendant presents a danger to himself or to the person or property of others.

(2)(A) The court must make a determination within one (1) year of a commitment pursuant to subsection (1) of this section.

(B) If the court, pursuant to the report of the Director of the Department of Human Services or his designee, or as a result of a hearing on the report, determines that the defendant is fit to proceed, prosecution in ordinary course may commence.

(C) If the defendant is unfit to proceed but does not present a danger to himself or to the person or property of others, the court may release the defendant on conditions it determines proper.

(D) If the defendant is unfit to proceed and presents a danger to himself, or the person or property of others, the court shall order the Director of the Department of Human Services to petition for an involuntary admission.

(c) When the court, on its own motion or upon application of the Director of the Department of Human Services, the prosecuting attorney, or the defendant, determines, after a hearing if one is requested, that the defendant has regained fitness to proceed, the criminal proceeding shall be resumed. If, however, the court is of the view that so much time has elapsed since the alleged commission of the offense in question that it would be unjust to resume the proceeding, the court may dismiss the charge.

In summary, if there is a reason to doubt a criminal defendant's fitness to pro-

ceed to trial, Section 305 allows the circuit court to suspend all proceedings and order the defendant to undergo a mental evaluation. "Section 305's" are, therefore, inmates ordered for evaluations. If the evaluation reflects a defendant lacks the fitness to proceed to trial, Section 310 allows the court to commit the defendant to the custody of the ASH for treatment until restoration of fitness to proceed. Thus, as to the issues in this litigation, "Section 305's" are inmates awaiting inpatient evaluation and "Section 310's" are inmates awaiting treatment.

### The Existing Situation:

The ASH is licensed for 315 beds. A "licensed bed" means a bed that is staffed with nursing, psychiatric, and psychology services. Costs are $400.00 per day to staff a licensed bed. The testimony of Dr. Larry Miller, medical director of the ASH since January 1, 1995, and medical director for the DMHS, revealed the ASH has 186 beds of which 64 are allocated for forensic patients, both evaluations and treatment. Although licensed for 315 beds, Dr. Miller stated the ASH does not have the space, nor the funding, nor the personnel to fill more than 186 beds, plus possibly a few more.

There is no real delineation between beds reserved for inpatient evaluations and beds reserved for treatment but there is an attempt to have at least one or two beds available for evaluations at all times. There is a shortage of beds for evaluations due to the number of beds used for treatment. Of the 186 total beds, thirty two are allocated for adolescents, i.e. children between the ages of thirteen to seventeen.

Sixty-four are allocated for forensic patients. The remaining ninety beds are the adult acute beds and are for patients who are there voluntarily or by civil commitment for treatment of mental illnesses. Plaintiffs' Exhibit 3 revealed that some of the acute care beds are being used for patients committed pursuant to Ark.Code Ann. 5–2–314. "Section 911"[3] patients are those patients who have been found not guilty by reason of mental defect. They have either been committed to the ASH for treatment or have been remanded to the custody of the ASH after violating the conditions of their release. When there are no beds on the forensic side, these individuals are put in the ninety bed acute care area. The forensic units and the acute care non-forensic units are staffed basically the same in terms of psychiatrists, nurses and psychologists. However, the forensic units are in a separate building and are staffed with public safety officers. Dr. Miller testified that at least half of the sixty-four forensic beds are now occupied by Section 911's.

### The Waiting List:

Due to the shortage of beds for forensic inmates, the ASH established a waiting list. The list contains the names of all of the potential inmate patients who have been court ordered to the ASH either for outpatient[4] or inpatient evaluation ( Section 305's) or treatment (Section 310's). Mr. Billy Burris, the assistant director for forensic services for the DMHS, is the keeper of the list. Mr. Burris sends weekly copies of the waiting list to Dr. Miller, Mr. Hill, the top administrative official at

---

3. The reference to "Section 911" patients comes from Act 911 of 1989, codified at Ark. Code Ann. 5–2–314.

4. At the time of trial, there were seventy-one Section 305 inmates waiting in various county jails for outpatient evaluations at the ASH. The average wait is almost five months. Inmates awaiting outpatient treatment are not a part of this class action. The issue regarding the wait for outpatient evaluations is an issue of shortage of staff, not a shortage of bed space, but outpatient evaluations impact the resources of the ASH for inpatient evaluation and treatment nonetheless.

the ASH, several other managers, and the admissions department. They are all aware that some individuals that have been court ordered for evaluations or treatment have been waiting for over a year for admission to ASH and that the length of time on the list has been increasing over the years. Occasionally, individuals are advanced on the list if a judge or family member complains about the waiting time. Those individuals for whom no one complains simply wait.

Dr. Miller described the state of the mental health system in Arkansas as in "crisis" because the number of referrals have increased, the ASH's ability to admit patients has decreased, and more patients are waiting in jail. He said he thought the system could "explode" due to the fact there are a large number of mentally ill who are not getting treatment and are confined in jails. He once described Mr. Burris' job, in terms of attempting to admit patients in the ASH, as "like moving the seats on the Titanic." (Excerpted Tr. Vol. 1 at 95) He acknowledged the seriously mentally ill inmates in jails who are not getting treatment are severely affected. He also acknowledged he was aware of the problems, along with Mr. Hill, Mr. Burris and John Selig, deputy director for the DHS, and former director of mental health.

Dr. Miller testified that the problems of the mentally ill were being pushed aside, not by people affiliated with the ASH, but by society in general. He stated that the employees at the ASH were using the resources available to them as creatively and efficiently as reasonably possible to attempt to meet the needs of the mentally ill.

*The Wait:*

Inmates court ordered for evaluations and/or treatment wait long periods of time, in some cases, one year or more, to get into the ASH. The average wait is over eight months for inpatient evaluations and over six months for inmates awaiting treatment.

Several witnesses testified as to their experiences with inmates on the waiting list. For example, Judge James Marschewski, a judge in the Sixth Division Circuit Court in Sebastian County, testified regarding two inmates. On February 3, 2001, Judge Marschewski signed an order committing William R. Vansant pursuant to Section 310 for treatment, but Mr. Vansant was not transferred to the ASH until October 16, 2001, ten months after he was ordered committed. Judge Marschewski also committed James Terry for treatment by Order entered February 3, 2001, but Mr. Terry was not transferred until August, 2001.

Faulkner County Sheriff Marty Montgomery housed an inmate named Jeffery Akins who had been waiting on the list for an evaluation since January 19, 2001, a period of 11 months. Indeed, Mr. Akins was still incarcerated at the Faulkner County jail at the time of this trial on December 10, 2001.

Judge John Plegge, a judge of the Seventh Division Circuit Court in Pulaski and Perry Counties, testified about his experience with delays in having his court orders carried out by the ASH. Gerard Jamel Jones was court ordered for treatment on February 28, 2001 and was still waiting at the time of trial. Judge Plegge considered inmate Sarah Sauls' situation to be an emergency[5]. He prepared the commitment order himself and called Chief Depu-

5. Judge Plegge noted this was the only time he had a doctor's report at plea and arraignment concerning a defendant. In this case, he decided Ms. Sauls needed immediate treatment based on the report from a neurologist stating that this young woman needed to be committed to the ASH for treatment and Ms. Sauls' personal and criminal history.

ty Skipper Polk of the Pulaski County jail for assistance in getting Ms. Sauls into the ASH. Although Chief Deputy Polk committed to do what he could, the ASH rejected Ms. Sauls because it had no room.

Chief Deputy Polk described a situation with an inmate named Michael McSpadden who was first ordered for an evaluation in January, 2000. The ASH actually admitted him in August, 2000 for less than one day and then sent him back to the Pulaski County jail. The Fifth Division Circuit Court held a show cause hearing in November, 2000 and the ASH took Mr. McSpadden back two days later. However, during his stay in jail awaiting the evaluation, Chief Deputy Polk reported that Mr. McSpadden broke a deputy's arm, assaulted inmates and deputies, tore things up, and had to be placed on the restraint list, meaning any time he was out of his cell, he was restrained.

Dr. Robin Ross[6] testified that James Roberts and Shawn McCallum both waited approximately one year before they were transported to the ASH for court ordered evaluations. These anecdotal reports indicate the severity of the situation at the ASH with numerous inmates on the waiting list, many of whom have been waiting one year or more for an evaluation or treatment.

### Results of Delayed Evaluation and Treatment:

#### 1. Lay witnesses experiences

Chief Deputy Polk testified that delays getting inmates that had been ordered for either evaluation or treatment into the ASH was a "tremendous problem." He further affirmed that neither the jail nor the jail staff were equipped to deal with mentally ill inmates.[7] He met with officials at the ASH to discuss a possible solution. A plan was developed whereby the state hospital personnel would come to the jail and attempt to perform some inpatient treatment. That plan was not successful, as the only treatment that could be given was medication. He stated the attitude of the ASH officials has been one of, "[s]o what. There's nothing we can do. We don't have any money." (Excerpted Tr. Vol. 2 at 7). Chief Deputy Polk also noted that even though the jail has psychiatrists and nurses that can administer medications, it is not feasible to give an injection in jail cells, so the inmate must be transferred to a private hospital and be guarded.

Other witnesses discussed the problems caused by delays in evaluations and treatment. Sheriff Jay Winters of Pope County testified the jails have to provide special treatment to mentally ill inmates for their protection and the protection of jailers and other inmates. This special treatment is very staff intensive since the mentally ill inmates must be escorted individually to their meals and to showers. Sheriff Winters also noted that community mental health facilities are reluctant to provide treatment when there is an existing order committing the inmate to the ASH.

Howard Keith Erler, a member of the class, attempted suicide three times while incarcerated in the Scott County jail prior to being transferred to the ASH for an evaluation. The situation became so grave during his wait that his mother had him committed to the ASH on a civil petition rather than continue to wait on "the list."

Sheriff Montgomery testified that inmate Jeffrey Akins (*see infra* p. 7), who

---

6. Dr. Robin Ross, a forensic psychiatrist, is referred to in detail at p. 11.

7. Chief Deputy Polk noted he had an inmate that "eats his flesh and spits it out." He also has an inmate that "eats his feces, drinks his urine, paints the walls, and paints his cell" with his body wastes.

had been waiting eight months for an evaluation at the ASH, came to jail believing people were controlling his mind and that he could read other people's minds. He testified that Mr. Akins coped with the jail environment for a short time but that his ability to cope changed dramatically after a few months. Sheriff Montomery reported that Mr. Akins now rarely eats, has to be supervised during meals by a guard to encourage him to eat, and has lost 25 pounds. Attempts were made to move him up the list, but to no avail.

Cash Haaser, the Public Defender that represented Mr. Vansant (*see infra* p. 7), noted a dramatic difference in Mr. Vansant between the time he saw him in late 1999 and September, 2001. Just prior to his transfer to the ASH, Mr. Vansant was non-responsive and could barely communicate.

### 2. Expert testimony

Dr. Robin Ross, a forensic psychiatrist,[8] is currently employed by the Ozark Guidance Center in northwest Arkansas. She is the inpatient treating psychiatrist at Northwest Medical Center. She previously worked at the ASH performing Section 305 evaluations and Section 310 treatments. While employed there, she identified the primary problem with the system of the delivery of mental health services to pretrial detainees in Arkansas to be the long waiting period in having inmates evaluated and treated.

Prior to trial, she interviewed Plaintiff Terry and performed a psychiatric evaluation at the ASH. She concluded Mr. Terry had a mental illness; his behavior was influenced by his mental illness; his men-

tal illness made it difficult for him to conform to procedures in jail; the lack of treatment of Mr. Terry's mental illness could have actually made his mental illness worse; and finally that, given proper treatment, Mr. Terry's condition could improve.

With respect to Howard Erler, Dr. Ross also conducted a psychiatric evaluation and found Mr. Erler had a mental illness with accompanying psychosis; he was not being treated in the Scott County jail for his mental illness; and that the failure of treatment contributed to his suicide attempts and the physical pain he now has in his arms.[9] She diagnosed Mr. Erler as having a major depressive episode with psychotic symptoms and stated that the treatment of this condition usually alleviated the symptoms. Furthermore, she noted that after Mr. Erler finally received treatment, he did in fact improve. She concluded that the failure to treat Mr. Erler while in jail actually made his condition worse and that the seriousness of his suicide attempts required inpatient hospitalization.

Dr. Ross opined that it is detrimental for the seriously mentally ill to be in jail. She stated that nationwide, anywhere from seven to fifteen percent of the jail population is comprised of the mentally ill. Dr. Ross estimated that the average in Arkansas was probably higher than the nationwide average because the forensic system here is slow. She testified that eighty percent or greater of the referrals to the ASH are in fact found to be mentally ill.

Dr. Ross testified that the mental health system at the ASH needed to change because mentally ill inmates are suffering and the delay in evaluation and/or treatment makes it more difficult to treat in-

---

**8.** Forensic psychiatry focuses on legal issues, such as the right to treatment, the right to refuse treatment, competency, confidentiality, psychiatric disabilities, and death penalty issues.

**9.** Mr. Erler attempted suicide in jail by slashing his wrists on three or four occasions.

mates once they are admitted to the hospital. In her opinion, Mr. Erler and Mr. Terry, representatives of the class, suffered greatly and continue to suffer from their lack of treatment. Dr. Ross stated that once inmates came into the custody of the ASH for either evaluation or treatment, they were adequately treated by the personnel. It was her impression while working with Mr. Burris and the forensic team at ASH, that Dr. Miller and Mr. Burris were doing the best they could under the circumstances.

Dr. Ross concluded it was detrimental for the seriously mentally ill to be in jail because they are not getting the treatment they need and the environment is counterproductive to treatment of their illness. She described the situation as the criminal justice system and the mental health system coming head-on at each other, then colliding, leaving the patient trapped in the middle. She noted the jailers are taught to react and respond one way when people act a certain manner, and that is "counterintuitive" to the way one would respond to somebody who is mentally ill. (Excerpted Tr. Vol. 3 at 60). The situation escalates in her opinion because a mentally ill person does not understand what they are being asked to do or because the jailors misinterpret what a mentally ill person is doing.

In addition to the harm caused by the delays in treatment, the filing of a motion for an evaluation stops the running of the speedy trial act. Obviously, this results in the denial of the defendant and the public to a speedy trial.

The foregoing specific examples, from both lay and expert witnesses, are not rare or out of the ordinary. On the contrary, they appear to accurately illustrate the existing situation throughout Arkansas' jails. Indeed, a veritable cavalcade of human tragedy marched through the record at trial. The Court finds that inmates that have been court ordered for evaluations or treatment are languishing in jail, causing them to suffer from lack of basic treatment and the severity of that suffering amounts to punishment.

*Law:*

■ The Eighth Circuit, when previously faced with constitutional questions concerning the treatment of pretrial detainees, has rejected tests based on the Eighth Amendments ban of cruel and unusual punishment.[10] "Although some courts have applied Eighth Amendment principles in evaluating conditions under which unconvicted persons are imprisoned, the Supreme Court has recently held that such conditions are to be judged by the due process standard of the Fifth and Fourteenth Amendments." *See Campbell v. Cauthron,* 623 F.2d 503, 505 (8th Cir.1980) (citing *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)).[11] *See*

---

**10.** However, the Eighth Circuit, on several occasions, has applied the Eighth Amendment's "deliberate indifference standard" to determine whether pretrial detainees have been subjected to unconstitutional conditions of confinement under the Fourteenth Amendment. *Hott v. Hennepin County,* 260 F.3d 901, 905 (8th Cir.2001) (applying deliberate indifference standard to claim that jail officials failed to prevent pretrial detainee's suicide); *Smith v. Copeland,* 87 F.3d 265, 268–69 (8th Cir.1996) (holding that pretrial detainee must show officers were deliberately indifferent to unsanitary conditions of confinement);

*Whitnack v. Douglas County,* 16 F.3d 954, 957 (8th Cir.1994) (applying a deliberate indifference standard to pretrial detainee's conditions of confinement claim.)

**11.** This was not an entirely novel concept, as the Supreme Court had previously recognized this distinction in *Ingraham v. Wright,* 430 U.S. 651, 671–672, n. 40, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977):

Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions. See

*also Villanueva v. George,* 659 F.2d 851 (8th Cir.1981) (applying the *Bell* test). "Under *Bell,* a pretrial detainee faces a lighter burden to show a constitutional violation than under the Eighth Amendment. *See Bell,* 441 U.S. at 537 n. 16, 99 S.Ct. 1861 (due process requires that a pretrial detainee not be punished; the Eighth Amendment requires that the punishment imposed not be cruel and unusual.)" *Adams v. Erwin Weller Co.,* 87 F.3d 269 (8th Cir.1996).

The Supreme Court, in *Bell,* held that "[i]n evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, ... the proper inquiry is whether those conditions amount to punishment of the detainee." *See Bell,* 441 U.S. at 535, 99 S.Ct. 1861. A court's reliance is properly placed "on the Due Process Clause rather than the Eighth Amendment in considering the claims of pretrial detainees." *See id.* n. 16. A person lawfully committed to pretrial detention has not been adjudged guilty of any crime; he has had only a "judicial determination of probable cause as a prerequisite to [the] extended restraint of [his] liberty following arrest." *See id.* at 536, 99 S.Ct. 1861 (quoting *Gerstein v. Pugh,* 420 U.S. 103, 114, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975)). "Under such circumstances, the Government concededly may detain him to ensure his presence at trial and may subject him to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution." *See id.* at 536–37, 99 S.Ct. 1861.

■ The Supreme Court also recognized, however, that "[n]ot every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense ...." See id. at 537, 99 S.Ct. 1861.

> Once the Government has exercised its conceded authority to detain a person pending trial, it obviously is entitled to employ devices that are calculated to effectuate this detention. Traditionally, this has meant confinement in a facility which, no matter how modern or how antiquated, results in restricting the movement of a detainee in a manner in which he would not be restricted if he simply were free to walk the streets pending trial. Whether it be called a jail, a prison, or a custodial center, the purpose of the facility is to detain. Loss of freedom of choice and privacy are inherent incidents of confinement in such a facility. And the fact that such detention interferes with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into "punishment."

*See id.* In fact, the Supreme Court has consistently recognized a distinction between punitive measures that may not constitutionally be imposed prior to a determination of guilt and regulatory restraints that may. *See, e. g., Kennedy,* 372 U.S. at

---

*United States v. Lovett,* 328 U.S. 303, 317–318, 106 Ct.Cl. 856, 66 S.Ct. 1073, 1079–1080, 90 L.Ed. 1252 (1946).... [T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law. Where the State seeks to impose punishment without such an adjudication,

the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment.

*See also Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 165–167, 186, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963); *Wong Wing v. United States,* 163 U.S. 228, 237, 16 S.Ct. 977, 41 L.Ed. 140 (1896).

168, 83 S.Ct. 554; *Flemming v. Nestor*, 363 U.S. 603, 613–614, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960); cf. *De Veau v. Braisted*, 363 U.S. 144, 160, 80 S.Ct. 1146, 4 L.Ed.2d 1109 (1960).

The Supreme Court in *Bell*, while discussing the traditional tests used to determine whether a governmental act is punitive in nature, quoted the aforementioned *Kennedy* decision, which itself examined the automatic forfeiture-of-citizenship provisions of the immigration laws to determine whether they amounted to punishment or a regulatory restraint:

> Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of *scienter*, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned are all relevant to the inquiry, and may often point in differing directions. [*Kennedy*, 372 U.S. at 168–169, 83 S.Ct. 554 (footnotes omitted).]

*See id.* at 537–38, 99 S.Ct. 1861. The Supreme Court went on to state that:

> The factors identified in [*Kennedy*] provide useful guideposts in determining whether particular restrictions and conditions accompanying pretrial detention amount to punishment in the constitutional sense of that word. A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on "whether an alternative pur-

pose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." *Kennedy*, 372 U.S. at 168–169, 83 S.Ct. 554. Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees. Courts must be mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility.

*See Bell*, 441 U.S. at 538–39, 99 S.Ct. 1861 (second and third alteration in original) (citations omitted). In addition the Supreme Court in *Bell* recognized that pretrial detainees "retain at least those constitutional rights that ... are enjoyed by convicted prisoners." *See Bell*, 441 U.S. at 545, 99 S.Ct. 1861.

### Constitutional Violations:

■ As previously noted, the Court finds that the delay in transferring court ordered pretrial detainees to the ASH for evaluation or treatment, amounts to punishment of the detainees. The lack of inpatient mental health treatment, combined with the prolonged wait in confinement, transgresses the constitution. The lengthy and indefinite periods of incarceration, without any legal adjudication of the crime charged, caused by the lack of space at ASH, is not related to any legitimate goal, is purposeless and cannot be constitutionally inflicted upon the members of the

class. While the Court will await the remedy phase of this litigation to attempt to determine what length of wait is constitutionally permissible, the length of wait experienced by inmates today is far beyond any constitutional boundary.

■ If the Court applied the standard of deliberate indifference to the facts of this case, the Court would find, looking at the entire state of Arkansas [12], including the executive and legislative branches, that the State has been deliberately indifferent to the needs of pretrial detainees ordered to receive mental health evaluations or treatment. In his official capacity, Mr. Hill is merely a representative of DHS, DMHS and the State of Arkansas in the system of mental health treatment. He is only able to operate the system under the financial structure allocated to his office from the Arkansas Legislature. Under the existing structure and financial system, DMHS has known for at least five years of the serious mental health needs of class members and has been aware that the failure to provide inpatient care to class members violated state circuit court orders. DMHS has known that the failure to provide inpatient care amounts to punishment of members of the class and increases the risk that they will harm themselves or others or suffer harm from other inmates. DMHS operates the ASH and has a duty to care for the mentally ill in Arkansas jails and knows that it has not done so. Attempts have been made but with no success.

Mr. Kinny Whitlock, the executive vice-president for the Mental Health Counsel of Arkansas ("the Counsel"), a nonprofit organization that provides education and advocacy on mental health issues, testifed as to attempts to remedy the situation. He opined that the mental health system with respect to pretrial detainees was not functioning and testified as to the reasons he thought they were not..

In an effort to alleviate the situation, Mr. Whitlock, a registered lobbyist for the Counsel, lobbied on behalf of proposed legislation that would have required or appropriated money to be used to set up crisis intervention programs and to pay for local inpatient care. Mr. Whitlock believed the bill would have provided a significant number of available beds at the ASH. The legislation authorizing expenditure of 11.5 million dollars, while passed into law, was never funded. Mr. Whitlock testified before the legislative counsel and wrote a letter outlining the crisis developing in the mental health system and why the bill was critically important. He testified that the members of the legislature admitted that Arkansas was in a situation where inmates languished in jails, could not obtain access to care, and the public mental health system might be on the verge of collapse. As previously noted, the legislation passed both the House and Senate and was signed by the Governor. It is still on the books. Although asked specifically to fund the bill, the legislature removed the language requiring funding.

Witnesses noted the difficulties in the system result from lack of funding from the State of Arkansas. However, "limited resources cannot be considered an excuse for not maintaining the institution according to at least minimum constitutional standards." *Finney v. Mabry*, 534 F.Supp. 1026, 1041 (E.D.Ark.1982). "If the State requires that certain persons be institutionalized, as it may, it has the corresponding obligation to meet their basic human needs . . . ." *Id.*

Dr. Miller noted the lack of treatment for the mentally ill is due more to a gener-

---

12. As previously noted, Mr. Hill, was sued in his official capacity as the director of the Division of Mental Health Services ("DMHS").

al societal attitude toward the mentally ill rather than a lack of caring by DMHS. No matter who is at fault, the State of Arkansas must address the mental health needs of the class members in this·case.

*Conclusion:*

The Court finds in favor of the Plaintiffs on the issue of liability, finding specifically that Plaintiffs' Constitutional rights to due process have been violated by the State of Arkansas. The Court will conduct a hearing to address the appropriate remedy, said hearing to be held on **Monday, June 10, 2002, at 10:00 a.m.** in Courtroom 5A, United States Post Office and Courthouse, 500 W. Capitol, Little Rock. If the parties desire to file briefs regarding the remedy, the parties may file simultaneous trial briefs on June 3, 2002. The parties are directed to exchange witness and exhibit lists on or before June 3, 2002.