COURT OF APPEALS
DECISION
DATED AND FILED

September 10, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP715-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2022CF3407

IN COURT OF APPEALS
DISTRICT I

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

J.D.B.,

DEFENDANT-APPELLANT.

APPEAL from an order of the circuit court for Milwaukee County: MILTON L. CHILDS, SR., Judge. *Reversed.*

Before Donald, P.J., Geenen and Colón, JJ.

¶1 GEENEN, J. Jared[1] appeals from an order of the circuit court committing him to the custody of the Department of Health Services ("DHS") and

---

[1] For ease or reading and to protect the confidentiality of these proceedings, we use the pseudonym "Jared" to refer to the defendant in this case.

permitting the involuntary administration of medication to restore Jared to competency to stand trial under WIS. STAT. § 971.14 (2021-22)[2] and *Sell v. United States*, 539 U.S. 166 (2003) (the "involuntary medication order"). In *Sell*, the Supreme Court declared that, before forcibly medicating an accused person to competency to stand trial, the State must prove by clear and convincing evidence that: (1) the State has an important interest in proceeding to trial; (2) involuntary medication will significantly further the State's interest; (3) involuntary medication is necessary to further the State's interest; and (4) involuntary medication is medically appropriate. *Id.* at 180-81. Wisconsin additionally requires, pursuant to § 971.14(3)(dm) and (4)(b), that the State prove that the accused person was incompetent to refuse medication.

¶2 Jared argues that the State failed to prove the *Sell* factors and that he was incompetent to refuse medication. The State argues that we should dismiss this case as moot because the involuntary medication order has expired. Alternatively, if we reach the merits, the State argues that it satisfied the requirements of both *Sell* and WIS. STAT. § 971.14(3)(dm) and (4)(b), and that the circuit court's findings are not clearly erroneous.

¶3 We conclude that even if the case is moot, an exception to the mootness doctrine applies because it raises significant constitutional issues that are "capable and likely of repetition and yet evade[] review[.]" *State v. Fitzgerald*, 2019 WI 69, ¶22, 387 Wis. 2d 384, 929 N.W.2d 165 (citation omitted). We further conclude that none of the *Sell* factors were satisfied. As to the first *Sell*

---

[2] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

factor, special circumstances exist in the instant case that, taken together, undermine the importance of the State's interest in bringing Jared to trial, including Jared's potential for future civil commitment and the length and circumstances of his pretrial detention. The second, third, and fourth factors each require an individualized treatment plan, and the proposed treatment plan for Jared is not adequately individualized. Finally, although the circuit court made findings under WIS. STAT. § 971.14(3)(dm) and (4)(b), those findings were clearly erroneous.

¶4 Accordingly, we reverse and vacate the circuit court's involuntary medication order.

## BACKGROUND

¶5 When the events underlying this case occurred, Jared was a nineteen-year-old with partial left-side paralysis, a lumbering gait, and compromised speech and cognitive abilities all stemming from a traumatic brain injury sustained from a self-inflicted gunshot wound when he was eleven years old. Subsequent to that injury, he was diagnosed with schizophrenia and major neurocognitive disorder due to the traumatic brain injury. Jared lived with his mother and siblings in Milwaukee.

¶6 According to the one-paragraph criminal complaint, police went to Jared's home on August 23, 2022, after his mother reported that he was making threats about getting a gun and killing everyone in the residence. Jared allegedly made statements to the officers about fighting them, and while arresting Jared, he allegedly threw two punches at one officer and hit the officer in the face. As the officers were handcuffing Jared, he allegedly threatened to kill the officer he had hit.

¶7    After his arrest, Jared was taken to an Aurora Health Care facility, but he was not admitted. Jared was booked into the Milwaukee County jail four days later, on August 27, 2022. It is unclear where Jared was held between the arrest and booking. The State charged Jared with battery to a law enforcement officer, a Class H felony. WIS. STAT. § 940.203(2).

¶8    On August 31, 2022, Jared appeared in court for the first time and his competency was raised. The circuit court ordered an examination of Jared's competency to proceed. Bail[3] was not considered, and Jared was immediately remanded into the custody of the Milwaukee County Sheriff's Department. Deborah L. Collins, PsyD, examined Jared and filed a report with the court dated September 19, 2022. Jared was detained in jail for nearly two months until a competency hearing could be held on October 11, 2022.

¶9    Dr. Collins's report notes that Jared's speech and cognitive abilities were compromised by a gunshot wound resulting in permanent brain damage, and that his medical history is significant for diabetes. The report concluded that Jared lacked "substantial mental capacity to understand the proceedings or assist in his defense." The report also indicated that Jared stated that he had previously been diagnosed with schizophrenia, and that while at the jail, he was diagnosed with an unspecified mental disorder and "secondary malignancy neoplasm brain," i.e., brain cancer.

---

[3] While the term "bail" has a specific statutory definition (i.e., "monetary conditions of release"), WIS. STAT. § 969.001(1), we use the term in this opinion as shorthand for any conditional pretrial release, monetary or otherwise.

¶10    According to Jared's mother, he was prescribed "Valproic acid (mood stabilizer/anti-convulsant) and Sertraline (anti-depressant)" and had received inpatient psychiatric treatment at three different hospitals. He was also seen at an Aurora Health Care facility "for homicidal thoughts" on August 23, 2022—the date of his arrest. While in jail, Jared was prescribed Depakote "for seizure disorder."

¶11    Based on the record review, Jared's history, and observations of Jared, Dr. Collins diagnosed Jared with schizophrenia and major neurocognitive disorder due to traumatic brain injury. At the time of the report, Jared was compliant with medications, and Dr. Collins did not evaluate whether he was competent to make treatment decisions. In an order signed October 11, 2022, the circuit court found that Jared was not competent to stand trial and committed him to the custody of DHS under WIS. STAT. § 971.14(5)(a). Jared remained in jail for an additional 106 days before he was transported for inpatient treatment.

¶12    Pursuant to the order for commitment, a 90-day commitment review was performed on Jared while he was still in jail. In the report, dated January 5, 2023, Sergio Sanchez, PsyD, stated that there was little change to Jared's condition, and alleged that Jared was not compliant with his medications. Jared remained in jail until January 25, 2023, when he was transported to Mendota Mental Health Institute for inpatient treatment.

¶13    A 180-day competency report was submitted to the circuit court by Ana Garcia, PhD, on March 28, 2023. In her report, Dr. Garcia notes that she reviewed records from seven different hospitals including Mendota, school records, jail records, and Milwaukee County Behavioral Health Division records.

5

In addition, she consulted with Jared's treating physician, Mitchell Illichmann, MD, and Mendota staff who worked with Jared.

¶14 Dr. Garcia's report notes that, in addition to having diabetes, Jared "is prescribed medication to prevent seizures that can be resultant from head injuries." At Mendota, Jared was diagnosed with unspecified neurocognitive disorder and unspecified schizophrenia spectrum and other psychotic disorder. At the time of the report, Jared had been at Mendota for just over two months and was being treated with antipsychotic and antidepressant medications. Despite the treatment, Jared is alleged to have sworn and spit at staff, urinated and defecated in his room, and continued to exhibit symptoms of schizophrenia.

¶15 It is unclear exactly when Jared began refusing his psychotropic medications,[4] but at the very latest, Jared was refusing medications on April 3, 2023, prompting Dr. Illichmann's request for involuntary medication on April 11, 2023. A hearing was held on April 24, 2023.

¶16 Dr. Illichmann's report filed with the request for involuntary medication stated that Jared was diagnosed with schizophrenia spectrum illness and had no physical health conditions. The report noted that Jared had previously taken lithium, valproate, paliperidone, and quetiapine "with only partial response." It does not mention Jared's diabetes or his seizure medication.

¶17 The proposed treatment plan then identified seven different antipsychotics "either in combination or in succession" to be taken orally. The

---

[4] Dr. Garcia's report notes that Jared "often refused to accept his psychotropic medication[,]" but it does not describe when this started or how consistently and frequently Jared refused. Dr. Illichmann testified that Jared began refusing medication on April 3, 2023.

plan did not outline an order in which each of these medications would be tried. Additionally, if Jared was unwilling or unable to take the oral medications, the plan recommended that the antipsychotic haloperidol be administered by injection. The plan also recommended one non-antipsychotic, lorazepam, to be injected for "agitation."

¶18     Dr. Illichmann testified regarding the purposes and side effects of each of the seven different antipsychotic medications.  Dr. Illichmann explained that he "list[s] multiple [medications] because sometimes people do not have response to the first medication tried[,]" so he "tend[s] to go through different medications sequentially, based on whether a person is seeing [a] benefit or not." The treatment plan listed a dose range for each of the medications based on the information the drug manufacturer submitted to the Food and Drug Administration ("FDA") as a proper range.  The treatment plan contained no details with respect to how often a dose of any particular medication would be administered, nor was there any evidence presented on this issue at the hearing.  Likewise, there is no evidence or indication that there is a maximum amount of a particular medication that can be administered in a given period of time.

¶19     Dr. Illichmann testified that before filing the request for involuntary medication, but on the same day the request was filed, April 11, 2023, he sat down with Jared and went through every medication listed on the treatment plan, addressing the side effects, advantages, and disadvantages of each.  Dr. Illichmann did not recall how long this meeting lasted.  Dr. Illichmann said that when he tried to discuss the advantages and disadvantages of the medications with Jared, Jared repeatedly responded that he felt he did not need medication.  Dr. Illichmann testified that he believed Jared "lacks ability to apply information about medications to himself or his situation" because when Dr. Illichmann "tried to

discuss the importance" of medications, Jared repeatedly answered that he felt like he did not need them.

¶20 After the close of evidence, the circuit court concluded that the State met its burden regarding each of the *Sell* factors. While discussing the third factor, whether medication is necessary to further the State's interest, the court noted that Dr. Illichmann "talked to the defendant about the advantages and disadvantages to restore the defendant" and that Jared "did not understand[.]" The circuit court entered the involuntary medication order on April 24, 2023, and Jared filed a notice of appeal the next day. We granted Jared's motion for an emergency temporary stay on April 26, 2023, and ordered further briefing on his request for a stay pending appeal. We granted Jared's request for a stay of the involuntary medication order on June 8, 2023.

¶21 On July 6, 2023, the circuit court held another competency hearing at which it found that Jared continued to lack substantial mental capacity and was not likely to be restored to competency within the statutory period. The circuit court ordered that this matter be converted to a civil commitment under WIS. STAT. ch. 51.

¶22 We held oral arguments on April 10, 2024, and on April 26, 2024, we ordered the parties to file additional briefs addressing the following issues:

1. Does a defendant ordered to submit to a competency examination under WIS. STAT. § 971.14(2) have a constitutional or statutory right to conditional pretrial release or a bail hearing, and if so, was that right violated as to [Jared]?

2. Does a defendant ordered to submit to competency restoration treatment under WIS. STAT. § 971.14(5) have a due process right to receive that care in a timely manner, and if so, was that right violated as to [Jared]?

*See Oregon Advoc. Ctr. v. Mink*, 322 F.3d 1101 (9th Cir. 2003).

The parties filed the additional briefs on May 10, 2024.

## DISCUSSION

¶23 On appeal, Jared argues that the involuntary medication order violates his Fifth and Fourteenth Amendment rights to refuse involuntary medication under *Sell*. Jared also argues that the State failed to prove by clear and convincing evidence that he was incompetent to refuse medication as required by WIS. STAT. § 971.14(3)(dm) and (4)(b).

¶24 The State's primary argument is that this case is moot because the involuntary medication order has expired. Alternatively, the State argues that it properly proved the *Sell* factors by clear and convincing evidence, and that the circuit court made the necessary findings under WIS. STAT. § 971.14(3)(dm) and (4)(b) regarding Jared's competency to refuse medications. We address each issue in turn.

### I. Mootness

¶25 The State first argues that the case is moot because the involuntary medication order has expired, and because "[t]he record does not show that [Jared] ever received medication involuntarily, pursuant to the April 24 order." Jared argues that the case is not moot because he *did* receive treatment after the circuit court entered the involuntary medication order but before the order was stayed,

and he is liable for the cost of that treatment.[5]  Jared also argues that, if the case is moot, we should decline to dismiss the case because the issues raised herein qualify for an exception to the mootness doctrine.

¶26   Generally speaking, courts "will not consider a question the answer to which cannot have any practical effect upon an existing controversy." *State v. Leitner*, 2002 WI 77, ¶13, 253 Wis. 2d 449, 646 N.W.2d 341 (citation omitted). However, collateral consequences to a challenged order may render an appeal not moot if there exists a "'causal relationship' between a legal consequence and the challenged order." *Sauk Cnty. v. S.A.M.*, 2022 WI 46, ¶20, 402 Wis. 2d 379, 975 N.W.2d 162.  Our supreme court has recognized that a causal relationship exists between a civil commitment order and a patient's liability for the cost of care under WIS. STAT. § 46.10(2).[6]  *S.A.M.*, 402 Wis. 2d 379, ¶24.  Whether a case is moot is a question of law that we review *de novo*.  *Id.*, ¶17.

¶27   Here, Jared argues that the case is not moot because he is liable for the costs of an injection he received under the involuntary medication order before it was stayed.  However, there is no evidence in the record that Jared ever received treatment under the involuntary medication order.  The only reference to Jared having received care under the involuntary medication order is in the competency

---

[5] During briefing, and relevant to the State's assertion that Jared had never been subject to involuntary medication, Jared discovered a competency examination report that indicated that Jared was administered "one injectable dose" under the involuntary medication order before the order was stayed.  The report was created after this case was transferred to the court of appeals, so it was not part of the record.  Jared moved under WIS. STAT. § 809.15(3) to supplement the record with this report, but we denied Jared's motion.

[6] WISCONSIN STAT. § 46.10(2), states that "any person, including but not limited to a person admitted, committed, protected, or placed under ... [§] 971.14(2) and (5) ... shall be liable for the cost of the care, maintenance, services and supplies in accordance with the fee schedule established by the department under [WIS. STAT. §] 46.03(18)."

examination report that was the subject of Jared's motion to supplement the record. We denied that motion, so it is not part of the record on appeal.

¶28 Nonetheless, we decline to dismiss Jared's appeal as moot. Dismissing a moot case "is an act of judicial restraint rather than a jurisdictional requirement." *Id.*, ¶19. Indeed, moot cases may "be decided on their merits in a variety of circumstances[.]" *Leitner*, 253 Wis. 2d 449, ¶14. We recognize exceptions to the mootness doctrine when an issue:

> (1) is of great public importance; (2) occurs so frequently that a definitive decision is necessary to guide circuit courts; (3) is likely to arise again and a decision of the court would alleviate uncertainty; or (4) will likely be repeated, but evades appellate review because the appellate review process cannot be completed or even undertaken in time to have a practical effect on the parties.

*Outagamie Cnty. v. Melanie L.*, 2013 WI 67, ¶80, 349 Wis. 2d 148, 833 N.W.2d 607; *see also Leitner*, 253 Wis. 2d 449, ¶14.

¶29 Although the *Sell* decision is over two decades old, there are few binding cases in Wisconsin interpreting and applying the *Sell* factors. In *State v. Green*, 2021 WI App 18, ¶¶17, 29-51, 396 Wis. 2d 658, 957 N.W.2d 583, we discussed at length the second, third, and fourth *Sell* factors as well as the requirement that an individualized treatment plan account for all three of those factors, but we did not discuss the first *Sell* factor because it was not in dispute. We agree with Jared that, given the importance of the rights and issues involved,

the duration of the appellate process,[7] and the maximum twelve-month timeline to restore competency under WIS. STAT. § 971.14, dismissal under these circumstances would effectively nullify a defendant's right to appeal "questions of clear constitutional importance." *Sell*, 539 U.S. at 176.

¶30    Accordingly, we move on to the merits of Jared's appeal.

## II.    The *Sell* Factors

¶31    Under the Fifth and Fourteenth Amendments, Jared has "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs." *Fitzgerald*, 387 Wis. 2d 384, ¶13 (quoting *Washington v. Harper*, 494 U.S. 210, 221 (1990)).  If the State seeks an involuntary medication order during criminal competency proceedings, the goal of that order is limited to "rendering the defendant *competent to stand trial*." *Sell*, 539 U.S. at 181 (emphasis in original).

¶32    In *Sell*, the Supreme Court declared that, before forcibly medicating an accused person to competency to stand trial, the State must show that: (1) the State has an important interest in proceeding to trial; (2) involuntary medication will significantly further the State's interest; (3) involuntary medication is necessary to further the State's interest; and (4) involuntary medication is medically appropriate. *Id.* at 180-81; *see also Green*, 396 Wis. 2d 658, ¶14.

---

[7] We observe that the Wisconsin Supreme Court recently ordered changes to appeals from orders under WIS. STAT. § 971.14, placing those appeals on expedited timelines. *See* S. CT. ORDER 23-05 (eff. July 1, 2024).  It remains to be seen if this order will result in the resolution of appeals before the expiration of the underlying § 971.14 orders, but regardless, we view the adoption of these rules as supporting our conclusion that the timeline of the regular appeals process frustrated a defendant's ability to seek appellate review of these orders before they expire.

"[O]nly an 'essential' or 'overriding' state interest" can overcome a defendant's constitutionally-protected liberty interest, and the Supreme Court predicted that "those instances may be rare." *Sell*, 539 U.S. at 179-80 (quoting *Riggins v. Nevada*, 504 U.S. 127, 134 (1992)).

¶33 "The State is required to prove the factual components of each of the four factors by clear and convincing evidence." *Green*, 396 Wis. 2d 658, ¶16. However, in *Green*, we observed that neither *Sell* nor Wisconsin courts have specified the appellate standard of review applicable to a circuit court's determination of whether these four factors are satisfied. *Green*, 396 Wis. 2d 658, ¶18. The majority of federal courts review the first factor *de novo*, although any factual findings relevant to this legal determination are subject to clearly erroneous review. *See, e.g.*, *United States v. Fieste*, 84 F.4th 713, 720 (7th Cir. 2023); *United States v. Tucker*, 60 F.4th 879, 886 (4th Cir. 2023); *United States v. Cruz*, 757 F.3d 372, 381-82 (3d Cir. 2014); *United States v. Brooks*, 750 F.3d 1090, 1096 (9th Cir. 2014); *United States v. Dillon*, 738 F.3d 284, 291 (D.C. Cir. 2013); *United States v. Gutierrez*, 704 F.3d 442, 450 (5th Cir. 2013); *United States v. Diaz*, 630 F.3d 1314, 1331 (11th Cir. 2011); *United States v. Fazio*, 599 F.3d 835, 839 (8th Cir. 2010); *United States v. Green*, 532 F.3d 538, 546, 552 (6th Cir. 2008); *United States v. Gomes*, 387 F.3d 157, 160 (2d Cir. 2004). These circuits also treat the remaining factors as fact questions subject to clearly erroneous review, although one circuit treats the second factor as a legal question reviewed *de novo*. *Green*, 396 Wis. 2d 658, ¶19 n.11.

¶34 In *Green*, it was uncontested that the State had satisfied the first *Sell* factor, and the *Green* court declined to resolve the question of the appropriate standard of review applicable to the remaining factors because it reached the same conclusion whether it applied "clearly erroneous" or "*de novo*" review. *Id.*, 396

13

Wis. 2d 658, ¶20. Here, however, whether the first *Sell* factor was satisfied is in dispute, and the parties disagree about the standard of review applicable to all four of the *Sell* factors.[8] Nonetheless, as was the case in *Green*, we reach the same conclusion with respect to all four *Sell* factors whether we apply a "clearly erroneous" or "*de novo*" standard of review. Thus, we do not resolve or discuss further the parties' arguments with respect to the applicable standard of review.

### a. The State's important interest in prosecuting Jared for a serious crime is undermined by special circumstances.

¶35 Relying on the details of the complaint, the State argues that it has an important interest in bringing Jared to trial because Jared is charged with a "serious crime"—battery to a law enforcement officer, a Class H felony. Jared argues that special circumstances exist in this case that lessen the importance of the State's interest. We agree with Jared.

¶36 Before a criminal defendant can be subject to involuntary medication, "a court must find that *important* governmental interests are at stake[,]" and the State's "interest in bringing to trial an individual accused of a serious crime is important." *Sell*, 539 U.S. at 180 (emphasis in original). Although *Sell* did not define "serious crime" and the federal circuit courts do not agree on a method for determining whether a crime is "serious" for purposes of

---

[8] Jared argues that all of the factors raise mixed questions of law and fact. Under that standard, the circuit court's factual findings are upheld unless clearly erroneous, but whether those facts meet the legal standard is a question of law that is reviewed *de novo*. *See State v. Green*, 2021 WI App 18, ¶19 n.11, 396 Wis. 2d 658, 957 N.W.2d 583; *see also Langlade Cnty. v. D.J.W.*, 2020 WI 41, ¶¶23-25, 391 Wis. 2d 231, 942 N.W.2d 277. It is not entirely clear what standard of review the State would have us adopt, but we note that the State highlights that the majority of federal circuits treat the first *Sell* factor as a legal question reviewed *de novo* while the last three *Sell* factors are subject to clear error review. *See United States v. Diaz*, 630 F.3d 1314, 1330 (11th Cir. 2011).

*Sell*, we observe that WIS. STAT. § 969.08 defines a "serious crime" for purposes of modifying or revoking bail, and that definition specifically includes battery to a law enforcement officer in violation of WIS. STAT. § 940.203. We further observe that Jared's alleged crime involves violence, and it carries a maximum penalty of six years imprisonment. WIS. STAT. §§ 939.50(3)(h); 940.203(2). We conclude that battery to a law enforcement officer is a "serious crime" for purposes of *Sell*. Therefore, in general, the State will have an important interest in bringing to trial a defendant charged with that crime.

¶37 However, *Sell* explicitly prohibits analyzing this factor in such a categorical fashion. It instructs courts to "consider the facts of the individual case in evaluating the [State's] interest in the prosecution. Special circumstances may lessen the importance of that interest." *Sell*, 539 U.S. at 180. That is, it is not enough that the State generally has an important interest in bringing to trial *anyone* charged with a serious crime to satisfy the first factor. The inquiry is whether, under the particular circumstances of each individual case, the State has an important interest in bringing *that defendant* to trial on that serious charge.

¶38 The United States Supreme Court identified two potential circumstances that might lessen the State's interest in prosecution: the potential for future civil commitment, and the length of pretrial detention. "The potential for future confinement affects, but does not totally undermine, the strength of the need for prosecution." *Id.* at 180. "The same is true for the possibility that the defendant has already been confined for a significant amount of time (for which he [or she] would receive credit toward any sentence ultimately imposed, see [WIS. STAT. § 971.14(2)(a) and (5)(a)3.])." *Sell*, 539 U.S. at 180. These considerations lessen the importance of the State's interest in prosecution because they "diminish

15

the risks that ordinarily attach to freeing without punishment one who has committed a serious crime." *Id.* at 180.

¶39     Here, it appears that the circuit court concluded that the first *Sell* factor was satisfied because Jared was charged with a "serious crime."  However, determining that the defendant is charged with a serious crime is only the first step in analyzing whether the first *Sell* factor is satisfied.  Courts must also consider the facts of the individual case to determine if special circumstances lessen the State's interest in prosecution.  *Id.*, at 180 ("Courts, however, *must* consider the facts of the individual case in evaluating the [State's] interest in prosecution."  (Emphasis added)).  On appeal, we consider the unique facts of Jared's case as mandated by *Sell*, and we conclude that the potential for future civil commitment and the length and circumstances of Jared's pretrial detention, taken together, undermine the State's interest in prosecution.

¶40     Our consideration of the special circumstances begins with the potential for Jared's future civil commitment.  Federal circuit courts analyzing this issue have largely focused on the likelihood of civil commitment, often finding that when the possibility of future civil commitment is uncertain and speculative, the State's interest in prosecution is not lessened.  *See, e.g.*, *United States v. Tucker*, 60 F.4th 879, 888 (4th Cir. 2023); *United States v. Cruz*, 757 F.3d 372, 388-89 (3d Cir. 2014); *United States v. Brooks*, 750 F.3d 1090, 1096-97 (9th Cir. 2014); *United States v. Grigsby*, 712 F.3d 964, 970-72 (6th Cir. 2013).  For example, in *United States v. Gutierrez*, 704 F.3d 442, 450 (5th Cir. 2013), the defendant did not appear eligible for civil commitment under federal or state law.  In *United States v. Nicklas*, 623 F.3d 1175, 1178-79 (8th Cir. 2010), the defendant argued that forcibly medicating him would place him in the same position that he currently faced (i.e., civil commitment in a medical facility), but the court rejected

16

that argument because the defendant confirmed that he would not present an "insanity" defense if brought to trial.

¶41    Here, however, the record reflects a significant potential for Jared's future civil commitment either through chapter 51 proceedings, WIS. STAT. § 51.20, or as the result of successfully asserting at trial a defense of not guilty by reason of mental disease or defect ("NGI"), WIS. STAT. §§ 971.15, 971.17.  The facts highlighted in the complaint, considered in the context of Jared's mental health diagnoses and the fact that he was seen at Aurora Health Care for "homicidal thoughts" on the date of the alleged offense, generally support an NGI defense and suggest that the alleged offense resulted from a mental health crisis that is currently being addressed through civil commitment proceedings.[9]  *Sell* instructed courts to consider the "potential" for future civil commitment, meaning that certainty that civil commitment will occur is not required in order for the State's interest in prosecution to be lessened.  *Id.*, 539 U.S. at 180.  In this case, there are distinct, non-speculative possibilities for Jared's future commitment through the ongoing chapter 51 proceedings or following a successful NGI defense, and as a consequence, the State's interest in bringing Jared to trial is lessened.

---

[9] "A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect the person lacked substantial capacity either to appreciate the wrongfulness of his or her conduct or conform his or her conduct to the requirements of law." WIS. STAT. § 971.15(1).  Because *Sell* requires that we consider the likelihood of future civil commitment (i.e., commitment under WIS. STAT. § 971.17 of persons found not guilty by reason of mental disease or mental defect), we observe that Jared would be required to establish his lack of substantial capacity under § 971.15(1) "to a reasonable certainty by the greater weight of the credible evidence."  Sec. 971.15(3).

¶42 Jared's pretrial detention is also a relevant special circumstance. One week after his arrest, Jared appeared in court for the first time where competency was raised, an examination was ordered, and Jared was immediately remanded into the custody of the Milwaukee County Sheriff's Department without conducting a pretrial detention hearing under WIS. STAT. § 969.035. Bail was not considered, but it should have been.[10]

¶43 WISCONSIN STAT. § 969.01 states that "[b]efore conviction, except as provided in [WIS. STAT. §§] 969.035[11] and 971.14(1r), a defendant arrested for a criminal offense is eligible for release under reasonable conditions designed to assure his or her appearance in court, protect members of the community from serious harm, and prevent the intimidation of witnesses." Looking to § 971.14(1r), the circuit court is directed to "proceed under this section whenever there is reason to doubt a defendant's competency to proceed." The question, then, is whether and when proceeding under § 971.14(1r) affects a defendant's eligibility for bail. The State argues that defendants become ineligible for bail the moment competency is raised and the circuit court is directed to proceed under § 971.14(1r). We disagree.

---

[10] The State argues that we should not discuss whether Jared was rendered ineligible for conditional pretrial release after reason to doubt his competency was raised and the court proceeded under WIS. STAT. § 971.14(1r). However, *Sell* requires that we consider the unique facts of Jared's pretrial detention in determining the strength of the State's interest in prosecution. Whether a portion of Jared's pretrial detention was contrary to law is directly relevant to that consideration.

[11] WISCONSIN STAT. § 969.035 provides situations in which the circuit court may deny pretrial release from custody, including holding a pretrial detention hearing under § 969.035(6). "If the court does not make the findings under sub. (6)(a) and (b) and the defendant is otherwise eligible, the defendant shall be released from custody with or without conditions in accordance with [WIS. STAT. §] 969.03." Sec. 969.035(7).

¶44 Specifically, defendants proceeding under WIS. STAT. § 971.14(1r) remain eligible for bail until the circuit court orders the defendant committed for treatment and suspends the criminal proceedings under § 971.14(5)(a)1. Section 971.14 contemplates and accounts for defendants released on bail prior to an order for commitment and suspension of proceedings, and therefore, proceeding under § 971.14(1r) does not immediately extinguish a defendant's eligibility for bail.

¶45 For example, WIS. STAT. § 971.14(2)(b) states that "[i]f the defendant has been released on bail, the court may not order an involuntary inpatient examination unless the defendant fails to cooperate in the examination or the examiner informs the court that inpatient observation is necessary for an adequate examination." If a defendant proceeding under § 971.14(1r) was rendered ineligible for bail immediately after competency is raised and an examination is ordered, but before the defendant is found to be incompetent and committed for treatment, § 971.14(2)(b) would cease to operate. *State ex rel. Kalal v. Circuit Ct. for Dane Cnty.*, 2004 WI 58, ¶46, 271 Wis. 2d 633, 681 N.W.2d 110 ("Statutory language is read where possible to give reasonable effect to every word, in order to avoid surplusage."). That is, there would be no need to account for defendants released on bail because those defendants would no longer be eligible. The plain language of the applicable statutes makes clear that it is only *after* the circuit court orders the defendant committed for treatment and suspends the proceedings that a defendant loses his or her eligibility for bail. Sec. 971.14(5)(a)1.

¶46 Jared was arrested on August 23, 2022, and proceedings were not suspended until the circuit court made its incompetency finding on October 11, 2022. He was detained for nearly two months without any of the due process

protections in WIS. STAT. ch. 969. This statutory violation is significant, and it lessens the importance of the State's interest in prosecution.

¶47  We also consider the timeliness with which individuals receive restorative treatment after commitment under WIS. STAT. § 971.14(5), but before they begin refusing treatment, to be a special circumstance relevant to the State's interest in prosecution.[12] It has long been the case that a criminal defendant "who is committed solely on account of his [or her] incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he [or she] will attain that capacity in the foreseeable future." *Jackson v. Indiana*, 406 U.S. 715, 738 (1972). Due process requires that "the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Id.*

¶48  The *Jackson* Court declined "to prescribe arbitrary time limits" for the reasonable duration of pretrial commitment, *id.*, but many courts interpreting and applying *Jackson* have concluded that defendants who have been found incompetent and committed to competency restoration treatment are entitled to a reasonably timely transfer to a facility that provides competency restoration treatment and cannot languish in jail without access to that treatment.

¶49  For example, in *Oregon Advocacy Center v. Mink*, 322 F.3d 1101, 1122 (9th Cir. 2003), the Ninth Circuit applied *Jackson* to restorative treatment

---

[12] The State, again, asks us to ignore the issue, but the timeliness with which an individual receives treatment before he or she begins refusing medication or treatment is relevant to the inquiry under *Sell*. Similar to our discussion of Jared's eligibility for bail, whether a defendant's detention was unlawful, in whole or in part, because he or she did not receive timely treatment is squarely within the framework of the first *Sell* factor.

services to hold that substantive due process prohibits the government from detaining "incapacitated criminal defendants in jail for weeks or months … because the nature and duration of their incarceration bear no reasonable relation to the evaluative and restorative purposes for which courts commit those individuals." It concluded that "only a mental hospital" and "not a county jail" could fulfil the competency restoration purposes of the incapacitated defendant's pretrial detention. *Mink*, 322 F.3d at 1122.

¶50 Other state and federal courts have likewise concluded that *Jackson* demands the timely administration of restoration treatment services to justify continued pretrial detention of incompetent defendants and observed the inadequacy of jails in fulfilling the purpose of competency restoration. *E.g.*, *Disability Law Center v. Utah*, 180 F.Supp.3d 998, 1009-12 (D. Utah 2016); *Terry ex rel. Terry v. Hill*, 232 F.Supp.2d 934, 941-44 (E.D. Ark. 2002); *J.K. v. State*, 469 P.3d 434, 440-45 (Alaska Ct. App. 2020); *Powell v. Maryland Dep't of Health*, 168 A.3d 857, 874, 876-77 (Md. 2017); *Lakey v. Taylor*, 435 S.W.3d 309, 316-21 (Tex. App. 2014); *State v. Hand*, 429 P.3d 502, 504-07 (Wash. 2018). In many of these cases, the unconstitutional delay between commitment and treatment was shorter than what Jared experienced in the instant case. *See, e.g.*, *Mink*, 322 F.3d at 1107, 1122-23 (upholding the district court's injunction requiring the Oregon state mental hospital to admit mentally incapacitated defendants within seven days of the judicial finding of their incapacity to proceed to trial); *Hand*, 429 P.3d at 503 (holding that the government violated the defendant's substantive due process rights by detaining him for seventy-six days before providing competency restoration treatment).

¶51 We agree that the constitution demands that an incompetent defendant's continued detention for competency restoration must be justified by

progress toward that goal. *Jackson*, 406 U.S. at 738. The defendant's due process rights are violated if the defendant fails to receive competency restoration treatment within a reasonable amount of time following the court's entry of the order of commitment under WIS. STAT. § 971.14(5).

¶52    In this case, Jared was ordered committed on October 11, 2022 and was to be transported "forthwith" to the appropriate facility for treatment, but he remained in the county jail until January 25, 2023, when he was transferred to Mendota for treatment. This is, in our view, a significant period of time that is incongruous with constitutional demands. We conclude that this unconstitutional detention further lessens the importance of the State's interest in prosecuting Jared for purposes of *Sell*.

¶53    In sum, the potential for Jared's future civil commitment and the length and circumstances of his pretrial detention, taken together, undermine the importance of the State's interest in prosecution. Jared was in-custody for 318 days from the date of the incident until at least July 6, 2023, when the case was converted to a civil proceeding. Spending over ten months in custody—nearly half of that in county jail—and waiting over three months to be transported to an appropriate facility for treatment is significant for a first-time, then-nineteen-year-old offender like Jared, and these special circumstances undermine the State's interest in prosecution. *See Sell*, 539 U.S. at 180.

### b. The State's proposed treatment plan for Jared is not adequately individualized.

¶54    Jared argues that the proposed treatment plan is not individualized to him. He says that "the State offered exactly what *Green* warned against: a generic treatment plan with no proposed dosages, dose ranges not individualized

22

to Jared, no discussion of Jared's medical conditions, and no meaningful restriction on length of treatment." The State disagrees, observing that unlike the testifying doctor in *Green*, Dr. Illichmann "personally examined [Jared] five times" before DHS filed the request for involuntary medication. The State argues that the medications identified and dose ranges proposed in the treatment plan are individualized to Jared and tailored to treat his specific medical conditions. We conclude, for several independent reasons, that the State's proposed treatment plan for Jared is not adequately individualized.

¶55 In *Green*, we explained that an individualized treatment plan was "a universal requirement" to satisfy the second, third, and fourth *Sell* factors. *Green*, 396 Wis. 2d 658, ¶37. An individualized treatment plan must identify:

> (1) the specific medication or range of medications that the treating physicians are permitted to use in their treatment of the defendant, (2) the maximum dosages that may be administered, and (3) the duration of time that involuntary treatment of the defendant may continue before the treating physicians are required to report back to the court[.]

*Green*, 396 Wis. 2d 658, ¶38 (citations omitted). Additionally, "the court must consider the individualized treatment plan as applied to the particular defendant." *Id.* We explained that

> [t]he defendant's age and weight, the duration of his or her illness, his or her past responses to psychotropic medications, his or her cognitive abilities, other medications he or she takes, and his or her medical record may all influence whether a particular drug given at a particular dosage for a particular duration is "substantially likely" to render the defendant competent.

*Id.*

23

¶56    Here, Jared's proposed treatment plan lacked a key element without which it could never be individualized to *anyone*, let alone Jared. While the plan identifies seven specific medications, each with a range signifying how much of a drug may be administered on a per-dose basis, the plan does not identify "the maximum dosages that may be administered" as required by *Green*, 396 Wis. 2d 658, ¶38. For example, Jared's plan identifies "Quetiapine" for treatment of psychosis, and the "dose range" identified is "50-800 mg." This means that an individual dose of Quetiapine can be a maximum of 800 mg under Jared's treatment plan, but there is no limit on the number of doses Jared can receive in any given period of time, i.e., on a "per day" or "per month" basis. *See id.*, ¶22 (observing that the individualized treatment plan "provided that Green would be administered Haldol at a maximum dose of ten milligrams *per day* and a maximum of 400 milligrams *per month for a period not to exceed twelve months*") (emphasis added)).

¶57    Without this information, it is impossible for a circuit court to know how much of any proposed drug will ultimately be administered to the defendant. It cannot know if the plan is "substantially likely to render the defendant competent to stand trial" and "substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense" as required by the second *Sell* factor. *Id.*, 539 U.S. at 181. It likewise cannot know if the medication is "necessary" to further the State's interest or if the medication is "'medically appropriate,' meaning that it is in the defendant's best medical interest in light of his or her medical condition[,]" as required by the third and fourth *Sell* factors. *Green*, 396 Wis. 2d 658, ¶16. As Jared correctly summarized, "the treatment plan is insufficient under *Sell* because

it delegates 'unfettered discretion' to physicians to treat Jared with the maximum dose of several medications at unrestricted frequencies."

¶58 There are additional problems with Jared's proposed treatment plan. While the identification of seven different antipsychotic medications is not problematic in itself, there needs to be evidence explaining how an unordered list of potential medications is individually tailored to a particular defendant. That is, if a specific order of medications is appropriate for a particular defendant, that needs to be explained to the circuit court, and if *no* order is appropriate, *that* needs to be explained to the circuit court. Here, Jared faces a veritable suite of potential medications, two of which are or can be administered by injection. There is no evidence that they will be tried in any particular order should Jared's condition not improve, and in any event, there was no testimony or evidence presented at the hearing that would explain why any particular order of medication, or no order at all, was appropriate as applied to Jared.[13]

¶59 Moreover, there is no evidence that the dose ranges provided in Jared's treatment plan were individualized to him. Dr. Illichmann testified that the dose ranges he listed for the proposed medications were based on the ranges submitted by the manufacturer to the FDA. Without more, this amounts to

---

[13] We observe that, during the hearing, Dr. Illichmann testified that he "list[s] multiple [medications] because sometimes people do not have response to the first medication tried[,]" so he "tend[s] to go through different medications sequentially, based on whether a person is seeing benefit or not." Here, "sequentially" means that Dr. Illichmann tends to go through the medications one at a time, rather than using some proposed medications in combination with other proposed medications. Noticeably absent from his testimony is any evidence that Dr. Illichmann evaluated or explained whether and why his typical approach was or was not appropriate as applied to Jared. Moreover, the treatment plan itself states that the proposed medications may be used "in combination" with each other, and Dr. Illichmann did not foreclose the possibility that he might prescribe one or more of the medications in combination with each other, testifying only that he "*tend[s] to* go through different medications sequentially[.]"

"offer[ing] a generic treatment plan with a medication and dosage that are generally effective for a defendant's condition[,]" and we explained in *Green* that this is not adequate. *Id.*, ¶34. If the generic dose range is appropriate for a particular defendant, that opinion needs to be explained to the circuit court before an otherwise generic dose range can be said to be "individualized" to a defendant. In other words, there was no evidence that Jared is a generic patient for which the generic dose range submitted by the manufacturer to the FDA would be medically appropriate.

¶60 Finally, the record demonstrates that important aspects of Jared's medical history were not considered. *See id.*, ¶34. For example, Dr. Illichmann's report claims that Jared has not been diagnosed with any physical health conditions, but that is plainly not true. Jared has been diagnosed with diabetes and was prescribed medication to prevent seizures resultant from his head injury. This is a significant oversight, because as Jared points out, the labels for nearly all of the proposed medications call for special precautions for individuals with diabetes or who are at a heightened risk of seizure. Neither Jared's diabetes nor his seizure medication were discussed or mentioned by Dr. Illichmann, either in his report or in his testimony. The circuit court likewise did not discuss Jared's medical history, simply noting that the plan was individualized because Dr. Illichmann "appeared" to be aware of the history. This is exactly the sort of delegation to the treatment provider disallowed by *Sell*. *Green*, 396 Wis. 2d 658, ¶44.

¶61 In sum, circuit courts cannot delegate to the treating physician their responsibility to determine whether the *Sell* factors have been met. *Green*, 369 Wis. 2d 658, ¶44. Because the circuit court determines whether the plan is sufficiently individualized and medically appropriate, the court must be provided a "complete and reliable medically informed record" from which to make those

findings. *Id.*, ¶¶2, 35. Because the record in this case is wanting in many critical respects, we conclude that Jared's proposed treatment plan is not adequately individualized, and therefore, the State failed to satisfy the second, third, and fourth *Sell* factors.

### III.    WISCONSIN STAT. § 971.14(3)(dm) and (4)(b)

¶62    Jared argues that the circuit court failed to make findings regarding Jared's competency to refuse medication under WIS. STAT. § 971.14(3)(dm) and (4)(b). The State argues that although the circuit court did not reference § 971.14(3)(dm) or (4)(b) expressly, it did find that Jared "did not understand" the advantages and disadvantages of treatment, and the court is not required to use "magic words" to satisfy its obligations under the § 971.14. We conclude that although the circuit court made findings under § 971.14(3)(dm) and (4)(b), those findings were clearly erroneous.

¶63    Jared's argument that the circuit court did not make findings under WIS. STAT. § 971.14(3)(dm) and (4)(b) requires us to interpret those provisions. "Judicial deference to the policy choices enacted into law by the legislature requires that statutory interpretation focus primarily on the language of the statute." *Kalal*, 271 Wis. 2d 633, ¶44. "Statutory interpretation presents a question of law that we review *de novo*." *Green*, 396 Wis. 2d 658, ¶52.

¶64     WISCONSIN STAT. § 971.14(4)(b)[14] states:

> [i]f the defendant is found incompetent and if the [S]tate proves by evidence that is clear and convincing that the defendant is not competent to refuse medication or treatment, under the standard specified in sub. (3)(dm), the court shall make a determination without a jury and issue an order that the defendant is not competent to refuse medication or treatment[.]

Section 971.14(3)(dm) sets forth the standard:

> The defendant is not competent to refuse medication or treatment if, because of mental illness ... and after the advantages and disadvantages of and alternatives to accepting the particular medication or treatment have been explained to the defendant, one of the following is true:
>
> 1. The defendant is incapable of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and the alternatives.
>
> 2. The defendant is substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his or her mental illness ... in order to make an informed choice as to whether to accept or refuse medication or treatment.

¶65     Dr. Illichmann testified that, prior to filing the request for an involuntary medication order, he sat down with Jared and went through every medication listed on the treatment plan to discuss the side effects and advantages and disadvantages of each. After explaining each medication, Jared continually

---

[14] In *State v. Fitzgerald*, 2019 WI 69, ¶2, 387 Wis. 2d 384, 929 N.W.2d 165, the Wisconsin Supreme Court held that WIS. STAT. § 971.14(4)(b) was unconstitutional to the extent it required courts to order involuntary administration of medication without addressing the factors set forth in the United States Supreme Court's opinion in *Sell*. The legislature has not repealed or amended § 971.14 in response to *Fitzgerald*, so circuit courts must continue to make findings required by § 971.14(4)(b) in addition to analyzing the *Sell* factors. That is, nothing about the addition of the *Sell* factor analysis extinguishes the State's burden under § 971.14(4)(b) to prove by clear and convincing that a defendant is incompetent to refuse medication under the standard set forth in § 971.14(3)(dm).

responded that he felt he did not need medication. Dr. Illichmann testified that he believed Jared "lacks ability to apply information about medications to himself or his situation" because when Dr. Illichmann "tried to discuss the importance" of medications, their side effects, and their advantages and disadvantages, Jared gave the repeated answer of feeling like he did not need them.

¶66 After the close of evidence, the circuit court concluded that the State met its burden regarding each of the *Sell* factors. While discussing the third factor, whether medication is necessary to further the State's interest, the circuit court noted that Dr. Illichmann "talked to the defendant about the advantages and disadvantages to restore the defendant" and that Dr. Illichmann felt that Jared "did not understand" that discussion.

¶67 The circuit court appears to have adopted Dr. Illichmann's conclusion that Jared lacked an understanding of the advantages and disadvantages of treatment based on Jared's repeated denial that he needed any of those medications after the side effects, advantages, disadvantages, and alternatives were explained to him. In our view, finding that the defendant lacked an understanding of the side effects, advantages, disadvantages, and alternatives to the proposed medications necessarily satisfies either or both subsections of WIS. STAT. § 971.14(3)(dm), provided that finding is not clearly erroneous. This must be true because a defendant cannot "express" or "apply" an understanding that he or she does not have.

¶68 We turn now to whether the circuit court's finding is supported by the record, and we conclude that it is not. Whether the statutory standard set forth in WIS. STAT. § 971.14(3)(dm) and (4)(b) have been met is a mixed question of law and fact where the circuit court's findings of fact will be upheld unless clearly

erroneous, but whether those facts meet the statutory standard is a question of law reviewed *de novo*. *Waukesha Cnty. v. J.W.J.*, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783.

¶69    Under WIS. STAT. § 971.14(3)(dm), the State must show that Jared was told "the advantages and disadvantages of and alternatives to accepting the particular medication or treatment[.]"  Our supreme court has described this language as "largely self-explanatory." *Melanie L.*, 349 Wis. 2d 148, ¶67.[15]  It explained:

> A person subject to a possible mental commitment or a possible involuntary medication order is entitled to receive from one or more medical professionals a reasonable explanation of proposed medication.  The explanation should include why a particular drug is being prescribed, what the advantages of the drug are expected to be, what side effects may be anticipated or are possible, and whether there are reasonable alternatives to the prescribed medication.  The explanation should be timely, and, ideally, it should be periodically repeated and reinforced.  Medical professionals and other professionals should document the timing and frequency of their explanations so that, if necessary, they have documentary evidence to help establish this element in court.

*Id.*

¶70    Dr. Illichmann testified that he explained the advantages, disadvantages, and alternatives to the proposed medications, and he repeatedly received the same response from Jared that Jared felt he did not need any medication.  However, Dr. Illichmann did not testify about the extent to which he

---

[15] Although *Outagamie County v. Melanie L.*, 2013 WI 67, 349 Wis. 2d 148, 833 N.W.2d 607 is a case involving a WIS. STAT. ch. 51 civil commitment, it interpreted language identical to the language in WIS. STAT. § 971.14(3)(dm) that we interpret here.

or others attempted to educate Jared, or the frequency with which these conversations were attempted. "[I]t is the responsibility of medical experts who appear as witnesses for the [State] to explain how they probed the issue of whether the person can 'apply' his or her understanding to his or her own mental condition." *Id.*, ¶75. We think it is likewise true that it was Dr. Illichmann's responsibility to explain how he probed the issue of why Jared did not believe he needed medication. Probing this issue was necessary for the circuit court to determine if Jared's lack of understanding was "because of mental illness" as required by the statute and not some other cause.

¶71 Moreover, in light of our conclusion that Jared's treatment plan was not adequately individualized to him, we have serious doubts as to the adequacy of the explanation given to Jared of the advantages, disadvantages, and alternatives to the medications proposed in that plan. There is no evidence that Dr. Illichmann told Jared that there was a maximum amount of dosages that he could receive of a given drug during a given period of time. There is no evidence that Dr. Illichmann discussed with Jared how these medications might interact with his diabetes or his risk of seizures. There is no evidence that Dr. Illichmann explained to him that the treatment plan allowed for him to use any of the proposed medications in combination with any others, even if his typical approach was to go through different medications sequentially. Based on this record, all we know is that Dr. Illichmann tried, once, on the same day that the request for involuntary medication was made, in a general, non-individualized manner and for an unknown amount of time, to discuss with Jared the advantages, disadvantages, and alternatives to the proposed medications. Jared said that he did not believe he needed them, and the interaction ended.

¶72    Accordingly, we conclude that although the circuit court made findings under WIS. STAT. § 971.14(3)(dm) and (4)(b), those findings were clearly erroneous.

## CONCLUSION

¶73    We conclude that even if this case is moot, it qualifies for an exception to the mootness doctrine because it raises significant constitutional issues that are "capable and likely of repetition and yet evade[] review[.]" *Fitzgerald*, 387 Wis. 2d 384, ¶21 (citation omitted). We further conclude that none of the *Sell* factors were satisfied in this case. As to the first *Sell* factor, special circumstances undermine the importance of the State's interest in bringing Jared to trial, including Jared's potential for future civil commitment and the length and circumstances of his pretrial detention. The second, third, and fourth factors each require an individualized treatment plan, and the proposed treatment plan for Jared is not adequately individualized. Finally, we conclude that although the circuit court made findings under WIS. STAT. § 971.14(3)(dm) and (4)(b), those findings were clearly erroneous.

¶74    Accordingly, we reverse and vacate the circuit court's involuntary medication order.

        *By the Court.*—Order reversed.

        Recommended for publication in the official reports.